# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| ROBERT C. BRAUN,<br><br>      Plaintiff,<br><br>v.<br><br>BYRON TERRY and<br>REYNALDO HERRERA,<br><br>      Defendants. | Case No. 15-CV-252-JPS<br><br><br><br><br><br>ORDER |

On February 25, 2015, the plaintiff, Robert C. Braun ("Braun"), filed this case in state court claiming that the defendants committed several constitutional and statutory violations during one of Braun's same-sex marriage protests[1] on the grounds of the Milwaukee County Courthouse. (Docket #1, Ex. 1 at 4-6). Pursuant to 28 U.S.C. § 1446(a), the defendants removed the action to the United States District Court for the Eastern District of Wisconsin. (Docket #1).

Since removal, Braun has filed two amended complaints (Docket #8, #19), added three defendants (Docket #8), and dismissed one defendant (Docket #53). Moreover, the Court granted the defendants' motion for partial

---

[1]Indeed, Braun is no stranger to litigation. Braun has filed numerous lawsuits relating to protests that he has staged. (Docket #47 ¶ 39); *see also Braun v. Baldwin*, 346 F.3d 761, 762 (7th Cir. 2003) (describing Braun as a "serial protester[] and arrestee[]…dedicated to the propagation of litigation.") (internal citations omitted).

judgment on the pleadings on June 25, 2015 (Docket #29),[2] which has left only two remaining defendants in this case: Sheriff Deputy Byron Terry ("Deputy Terry") and Sheriff Deputy Reynaldo Herrera ("Deputy Herrera").

Braun claims, under 42 U.S.C. § 1983, that Deputy Terry has: (1) violated Braun's freedom of speech and assembly rights under the First Amendment;[3] and (2) violated Braun's equal protection and due process rights under the Fourteenth Amendment.[4] (*See generally* Docket #19). Also, Braun claims that Deputy Herrera is liable under 42 U.S.C. § 1983 for failing to intervene in Deputy Terry's conduct. (Docket #19 at 4).

---

[2]The motion was brought by Milwaukee County Executive Chris Abele ("Abele"), Milwaukee County Sheriff David A. Clarke ("Clarke"), Milwaukee County, and Deputy Terry, collectively "the movants." (*See* Docket #15). The Court granted the motion dismissing the following claims: (1) Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb, et seq., claims against the movants; (2) Misconduct in Public Office, Wis. Stat. Ann. § 946.12, claims against the movants; (3) a *Monell* claim against Milwaukee County; and (4) Section 42 U.S.C. § 1983 claims—for violations of the First and Fourteenth Amendments—against Clarke and Abele. (Docket #29 at 17).

[3]Though Braun's complaint is far from a model of clarity, he makes two references to the "free exercise" and "practice" of his religion. (*See* Docket #19 ¶¶ 11, 24). The Court disposed of Braun's religious discrimination claims under RFRA in its Order on the defendants' motion for partial judgment on the pleadings. (*See* Docket #29). To the extent Braun's conclusory statements could be stretched to assert an independent claim under the Free Exercise Clause, it would be meritless. There is no evidence Deputy Terry even knew of Braun's religion; his actions on June 7, 2014, were instead motivated by a reasonable and, indeed, significant, concern over safety and order at the Courthouse. (*See infra* Part 3.1.2); *see also Listecki v. Official Comm. of Unsecured Creditors,* 780 F.3d 731, 742-43 (7th Cir. 2015) (reiterating the view that state action which is religiously neutral and of general applicability is not actionable under the Free Exercise Clause.)

[4]The defendants' summary judgment briefs also argue that Deputy Terry is not liable under RFRA or for misconduct in public office. (*See* Docket #42 at 17-18). However, as these claims have previously been disposed of with respect to Deputy Terry (*see* Docket #29), the Court will not re-visit these issues.

Deputy Terry and Deputy Herrera filed a motion for summary judgment on September 1, 2015. (Docket #41). As there are no genuine issues of material fact for trial, and the defendants are entitled to judgment as a matter of law, the Court will grant the defendants' motion.

1.      BACKGROUND[5]

On Friday, June 6, 2014, Judge Crabb issued an order declaring Wisconsin's state law ban on same-sex marriages unconstitutional. (Docket #47 ¶ 5); *Wolf v. Walker*, 986 F. Supp. 2d 982, 1028 (W.D. Wis. 2014). The next day, Saturday, June 7, 2014, the Milwaukee County Courthouse (the "Courthouse") opened outside of its normal business hours to allow couples, including same-sex couples, to apply for marriage licenses and get married. (Docket #47 ¶ 6.) More than 70 couples were married at the Courthouse on June 7, 2014. (Docket #47 ¶ 7).

---

[5]The facts are taken from the defendants' proposed findings of fact, unless otherwise indicated. (*See* Docket #47). This is in large part because Braun did not file proposed findings of fact as required by Civil Local Rule 56.2(b). Moreover, Braun did not verify his complaint, which means that the factual allegations in the second amended complaint cannot be considered evidence. *See Ford v. Wilson*, 90 F.3d 245, 246-47 (7th Cir. 1996) ("Rule 56(e) of the Federal Rules of Civil Procedure provides that when a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the…party's pleading."). Instead, Braun merely filed a brief opposing the defendants' motion. (Docket #58). Likewise, he filed an "objection" seven weeks after the defendants filed their motion and a "supplement" another week thereafter. Needless to say, the "objection" and "supplement" were filed far beyond the 30-day response time allowed under Civil Local Rule 56.2(b). Nonetheless, even taking the facts outlined in these documents in the light most favorable to Braun, the undisputed facts show that the defendants are entitled to judgment as a matter of law.

The Courthouse is located at 901 North 9th Street, Milwaukee, Wisconsin, 53233. (Docket #47 ¶ 8). The public may enter and exit the building on the south side of the building facing Wells Street (the "Wells Street Entrance"). (Docket #47 ¶ 9) Outside of the Courthouse, in front of the Wells Street Entrance, are concrete steps leading down to a water fountain, a large concrete walking space around the water fountain, concrete walkways leading to 10th Street and Wells Street, and a large grassy area. This area outside the Courthouse is a County Park known as Alfred C. Clas Park ("Clas Park"). *See* MILWAUKEE COUNTY PARKS, http://county.milwaukee.gov/ImageLibrary/Groups/cntyParks/maps/Clas.pdf (last visited Nov. 17, 2015) [hereinafter MILWAUKEE COUNTY PARKS].

On June 7, 2014, couples applied for marriage licenses and were married both inside and outside of the Courthouse around the Wells Street Entrance. (Docket #47 ¶ 11). For crowd control purposes and public safety reasons, only those individuals with official business were allowed inside the building. (Docket #47 ¶ 12).

Braun has opposed the legality of same-sex marriages for religious reasons. (Docket #47 ¶ 14). So, when Braun learned that the Courthouse would be open on Saturday, June 7, 2014, and that same-sex marriage licenses would be issued, he decided to protest. (Docket #47 ¶¶ 13-14). That morning, Braun, his wife, and a friend, Colin Hudson, met in front of the Wells Street Entrance. (Docket #47 ¶ 15). The group held up homemade signs reading "shame" and "no same-sex," in a grassy area approximately 20 feet east of the water fountain in front of the Wells Street Entrance. (Docket #47 ¶ 16-17).

Case 2:15-cv-00252-JPS   Filed 11/30/15   Page 4 of 23   Document 67

Supporters of same-sex couples were also present and displaying signs near Braun. (Docket #47 ¶ 18). At one point, some of these same-sex marriage supporters started to form a line and advance toward Braun, Braun's wife, and Colin Hudson. (Docket #47 ¶ 18). Braun admits that he believed that the supporters of the same-sex marriage couples were trying to intimidate him and that he felt threatened. (Docket #47 ¶ 18; Docket #58 at 2).

Deputy Terry was assigned to the Courthouse on June 7, 2014, and was outside the building in front of the Wells Street Entrance at approximately 10:00 a.m. patrolling the area. (Docket #47 ¶ 19). Deputy Terry witnessed same-sex marriage supporters approaching Braun and told those protesters to move away from Braun. (Docket #47 ¶ 19). Deputy Terry also ordered Braun to move away from the grassy area and over to the water fountain approximately 20 feet to the west. (Docket #47 ¶ 20). Deputy Terry states that he required Braun to move because Braun's protest had begun to interfere with the performance of weddings outside of the Courthouse. (Docket #47 ¶ 21). Thereafter, Braun remained near the water fountain, where he protested for approximately one and a half hours. (Docket #47 ¶ 22). During this time, however, Braun claims same-sex marriage protesters were allowed to protest "wherever they wanted." (Docket #58 at 2-3).

During his protest, Braun attempted to enter the Courthouse at least once, but was turned back by Deputy Terry because Deputy Terry did not believe that Braun had any official business in the building.[6] (Docket #47 ¶ 24). Deputy Terry told Braun that he would be issued a county citation if he refused to obey multiple requests that Braun not interfere with same-sex

---

[6]Braun admits that he had no legitimate business in the Courthouse on June 7, 2014. (Docket #47 ¶ 25).

couples and their supporters. (Docket #47 ¶ 25). Braun claims he had a conversation with Joseph Czarneczki[7] who told him that "he has a right to enter the courthouse anytime he wants" and "cannot be restricted." (Docket #58 at 2).

Deputy Herrera was posted inside the Courthouse on June 7, 2014. (Docket #47 ¶ 27.) Shortly after 10:00 a.m., Deputy Herrera responded to a request by radio from Deputy Terry to assist him outside in front of the Wells Street Entrance because of the number of people in the area. (Docket #47 ¶ 27.) Deputy Herrera came out of the Courthouse shortly after receiving the radio call and saw Deputy Terry interacting with Braun from a distance of approximately 20 feet away. (Docket #47 ¶ 28.) Deputy Terry then terminated his interaction with the three individuals; Deputy Herrera claims that he did not hear any exchange between Deputy Terry and Braun.[8] (Docket #47 ¶ 28.)

Braun departed the Courthouse approximately an hour and a half later. (Docket #47 ¶ 32). Braun was not arrested or issued a county citation while at the Courthouse. (Docket #47 ¶ 33). Several local television stations covered his protest of same-sex marriage. (Docket #47 ¶ 37).

2.    LEGAL STANDARD

When a party files a motion for summary judgment, it is their "contention that the material facts are undisputed and the movant is entitled to judgment as a matter of law." *Hotel 71 Mezz Lender LLC v. Nat. Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015) (citing Fed. R. Civ. P. 56(a)). "Material facts"

---

[7]Joseph Czarneczki is the Milwaukee County Clerk. *See* MILWAUKEE COUNTY CLERK: JOSEPH J. CZARNECZKI, http://county.milwaukee.gov/CountyClerk (last visited Nov. 17, 2015).

[8]Braun disputes this and claims that Deputy Herrera heard the conversation. (Docket #58 at 3).

are those facts which "might affect the outcome of the suit," and "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, to have a genuine dispute about a material fact, a party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 474 U.S. 574, 586 (1986); namely, the party in opposition "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

"Where…the movant is seeking summary judgment on a claim as to which it bears the burden of proof, it must lay out the elements of the claim, cite the facts it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claims." *Hotel 71 Mezz*, 778 F.3d at 601. In analyzing whether summary judgment should be granted, a court must draw all reasonable inferences from the materials before it in favor of the non-moving party. *Id.* When a court denies a motion for summary judgment it "reflects the court's judgment that one or more material facts are disputed or that the facts relied on by the motion do not entitle the movant to judgment as a matter of law." *Id.* at 602.

3.     ANALYSIS

"To state a claim under § 1983, the [plaintiff] must demonstrate that the defendant deprived him of a right secured by the Constitution and that in doing so the defendant acted under color of state law." *White v. City of Markham*, 310 F.3d 989, 997 (7th Cir. 2002); *see also* 42 U.S.C. § 1983. As Braun

Case 2:15-cv-00252-JPS   Filed 11/30/15   Page 7 of 23   Document 67

claims that Deputy Terry is liable for both First and Fourteenth Amendment violations, and Deputy Herrera is liable for failing to intervene in the same, each claim will be discussed in turn.

### 3.1 First Amendment Claims

Braun claims that Deputy Terry violated his First Amendment speech and assembly rights by: (1) limiting the area in which Braun was allowed to protest based on the content of Braun's message; and (2) failing to allow Braun inside the Courthouse on June 7, 2014. (*See generally* Docket #19, #58). First, the defendants argue that the Courthouse and the area surrounding the building are a "nonpublic" fora and, as such, the reasonable, viewpoint-neutral restrictions imposed by Deputy Terry did not violate the First Amendment. (*See* Docket #42 at 5-7). Alternatively, even if a higher level of scrutiny applies to Deputy Terry's actions, the defendants argue that the restrictions placed on Braun on June 7, 2014, were content neutral, narrowly tailored to serve a significant government interest, and left open ample alternative channels of communication.[9] (*See* Docket #42 at 10-12). Thus, according to the defendants, under either analysis, Deputy Terry's actions did not give rise to a cognizable First Amendment claim.

---

[9]Though Braun does not specifically argue this point, his brief appears to assert that the Courthouse grounds are a public forum. (*See* Docket #58 at 2) ("[T]he area that Terry restricted…was actually part of the concrete sidewalk leading to the Courthouse."). Though this argument is unclear, the Court must nonetheless determine the type of forum that Braun protested in for purposes of the First Amendment analysis. *See Milwaukee Deputy Sheriffs' Ass'n v. Clarke*, 588 F.3d 523, 530 (7th Cir. 2009).

Case 2:15-cv-00252-JPS   Filed 11/30/15   Page 8 of 23   Document 67

The First Amendment guarantees both the freedom of speech and the freedom of assembly. *See* U.S. Const. amend. I. Courts "evaluate free speech and free assembly claims under the same analysis." *Stagman v. Ryan*, 176 F.3d 986, 999 (7th Cir. 1999).

"There is no doubt that as a general matter peaceful picketing and leafletting are expressive activities involving 'speech' protected by the First Amendment." *United States v. Grace*, 461 U.S. 171, 176 (1983). However, "First Amendment rights are not absolute." *Braun v. Baldwin*, 346 F.3d 761, 763 (7th Cir. 2003). "Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799-800 (1985). As such, courts employ a "forum analysis" to determine the proper level of scrutiny to apply when evaluating time, place, and manner restraints on speech. *Clarke*, 588 F.3d at 530.

The conduct that Braun complains of occurred both inside and outside the Courthouse. (*See generally* Docket #19). First, the interactions between Braun and Deputy Terry took place on the grassy area and near the water fountain, both of which are outside of the Courthouse and within Clas Park. (Docket #47 ¶¶ 10, 16); *see also* MILWAUKEE COUNTY PARKS, *supra* Part 1. Second, Braun complains about his inability to enter the Courthouse. (Docket #47 ¶ 24). Thus, to analyze Braun's First Amendment claim, the Court must determine whether the interior of the Courthouse and Clas Park are public, designated public, or nonpublic fora. *Clarke*, 588 F.3d at 530.

### 3.1.1. Clas Park is a Public Forum and The Courthouse is a Nonpublic Forum

There are three categories of "fora" for the purposes of a First Amendment free speech claim:

> The first category of property is the traditional public forum; this is an area, like a sidewalk or a public park, that has traditionally been used for expressive activity. A second category of public property is the designated public forum. These are areas that the government has dedicated to use by the public as places for expressive activity. They may be opened generally for all expressive activity. Or, they may be designated for more limited purposes such as use by certain groups, or discussion of certain subjects. The final category of property, of course, is the nonpublic forum.

*Air Line Pilots Ass'n, Int'l v. Dep't of Aviation of City of Chicago*, 45 F.3d 1144, 1151 (7th Cir. 1995) (internal citations omitted).

"The relevant forum is defined by focusing on 'the access sought by the speaker.'" *Id.* (internal citations omitted). On the one hand, "[a] traditional public forum, such as a street or a park, is property that by long tradition or by government fiat…has been devoted to assembly and debate." *DeBoer v. Vill. of Oak Park*, 267 F.3d 558, 565 (7th Cir. 2001) (internal citations omitted). "'[P]ublic places' historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be 'public forums.'" *Grace*, 461 U.S. at 177.

"A designated public forum, in contrast, is a forum created by the government, not through inaction or by permitting limited discourse, but only by intentionally opening a nontraditional public forum for public discourse." *DeBoer*, 267 F.3d at 566 (internal citations omitted). In determining whether a space is a designated public forum, the Court must

consider: (1) whether the government "intended to designate a place not traditionally open to assembly and debate as a public forum," *id.* (internal citations omitted); and (2) the nature of the property and its compatibility with expressive activity, *Air Line Pilots Ass'n, Intern.*, 45 F.3d at 1152.

"Other government properties are either nonpublic fora or not fora at all." *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998). "In distinguishing between designated and nonpublic forums…the more selective the government is in restricting access to its property, the more likely that property will be considered a nonpublic forum." *Id.* at 565.

Here, the Seventh Circuit has established that the interior of a Courthouse is a nonpublic forum. *See Sefick v. Gardner*, 164 F.3d 370, 372 (7th Cir. 1998) (holding that the courthouse lobby was a nonpublic forum); *see also Braun*, 346 F.3d at 762 ("Newspapers and the streets outside are open to scathing criticism of what happens within the courthouse. But the halls of justice may be kept hushed."). This is because:

> the function of a courthouse and its courtrooms is principally to facilitate the smooth operation of a government's judicial functions.…[T]he presiding judge is charged with the responsibility of maintaining proper order and decorum. In carrying out this responsibility, the judge must ensure that the courthouse is a place in which rational reflection and disinterested judgment will not be disrupted.…

*Huminski v. Corsones*, 396 F.3d 53, 91 (2d Cir. 2005) (internal citations omitted); *see also Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 966 (9th Cir. 2002) (holding that judicial and municipal complexes are nonpublic forums); *Berner v. Delahanty*, 129 F.3d 20, 26 (1st Cir. 1997) ("A courthouse—and, especially, a courtroom—is a nonpublic forum."); *United States v. Gilbert*, 920 F.2d 878, 884 (11th Cir. 1991) (holding that a courthouse

Case 2:15-cv-00252-JPS   Filed 11/30/15   Page 11 of 23   Document 67

was a nonpublic forum, but an unenclosed courthouse plaza was a designated public forum).

On the other hand, public parks, such as Clas Park, "are public places that have traditionally been open for all manner of constitutionally protected speech." *Milestone v. City of Monroe, Wis.*, 665 F.3d 774, 783 n.3 (7th Cir. 2011). "'[S]treets, sidewalks, parks and other similar public places are so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising such rights cannot constitutionally be denied broadly and absolutely.'" *Marcavage v. City of Chicago*, 659 F.3d 626, 630 (7th Cir. 2011) (citing *Carey v. Brown*, 447 U.S. 455, 460 (1980)); *see also Forbes*, 523 U.S. at 673 ("In the case of streets and parks, the open access and viewpoint neutrality commanded by the [public forum] doctrine is 'compatible with the intended purpose of the property.'") (internal citations omitted).

The defendants, while acknowledging the fact that the area in which Braun protested is known as "Clas Park," nonetheless argue that Braun's protest venues are better categorized as nonpublic or designated public fora. (Docket #47 ¶ 10). Relying on the Supreme Court's dicta in *Grace*, the defendants argue that Braun protested on the "grounds" of the Milwaukee County Courthouse. (*See* Docket #42 at 6-7). However, nothing in *Grace* suggests that the Supreme Court's grounds constitute, or are located within, a public park. Indeed, the Court in *Grace* reaffirmed its view that "the right to conduct expressive activities in such areas as…parks…is reinforced by their traditional use for purposes of assembly." *Grace*, 461 U.S. at 184.

In sum, the undisputed facts show that Deputy Terry and Braun's interactions took place on the grassy lawn and near the water fountain, both of which are outside the Courthouse and within Clas Park.[10] *See* MILWAUKEE COUNTY PARKS, *supra* Part 1. Thus, because Clas Park is a public park in Milwaukee County, the Court must apply heightened scrutiny to Deputy Terry's actions. However, the interior of the Courthouse is a nonpublic forum, and Braun's speech activity relative to the Courthouse must be analyzed accordingly.

### 3.1.2 Deputy Terry Did Not Violate Braun's Freedom of Speech and Assembly Rights

"The standard of scrutiny to which a court subjects restrictions on speech depends on the type of property involved." *Air Line Pilots Ass'n, Int'l*, 45 F.3d at 1151 (internal citations omitted). In the context of speech regulations in a public forum, "the time, place, and manner of a speaker's activities can be regulated without violating the First Amendment so long as the restrictions are (1) content-neutral, (2) narrowly tailored to serve a significant government interest, and (3) leave open ample alternative channels for communication." *Marcavage*, 659 F.3d at 630 (citing *Perry Educ. Ass'n*, 460 U.S. at 45). On the other hand, "restrictions on speech [in a

---

[10]Of course, forum designation is a highly fact-driven inquiry. *Air Line Pilots Ass'n, Int'l*, 45 F.3d at 1152. One fact not addressed by the defendants, but significant nonetheless, is the fact that marriages on June 7, 2014, were taking place both inside *and* outside the Courthouse. (*See* Docket #47 ¶ 11) (explaining that couples were married outside the Wells Street Entrance). While this fact might suggest that Clas Park became a de facto nonpublic forum in light of the circumstances, this indeed would be a distinction without a difference. The outcome of this case would not change, as even under strict scrutiny, Deputy Terry's actions pass constitutional muster (*see* Part 3.1.2), and as such summary judgment is appropriate. *See Hotel 71 Mezz*, 778 F.3d at 602.

nonpublic fourm] need only be reasonable and may not discriminate on the basis of viewpoint." *Air Line Pilots Ass'n, Int'l*, 45 F.3d at 1151.

Deputy Terry's order that Braun re-locate from the lawn and protest near the water fountain was content neutral. Importantly, the impetus for Deputy Terry's order was the fact that an altercation between Braun and same sex marriage protesters nearly erupted on the grass. (Docket #47 ¶ 18). Specifically, same-sex marriage supporters "started to form a line and advance toward Braun." (Docket #47 ¶ 18). Indeed Braun admits that he "feared for [his] immediate safety" when the same-sex marriage supporters "got within a foot of" him. (Docket #58 at 2). Braun actually supported Deputy Terry's actions in protecting Braun from this potential quarrel. (Docket #47 ¶ 19). Under these facts, the first prong of the strict scrutiny test is satisfied because Deputy Terry's order that Braun re-locate and protest near the water fountain did not discriminate based on the content of Braun's message; rather, it drew an appropriate line between the feuding protesters.

In addition, Deputy Terry's order served compelling government interests of safety and security. The circumstances of June 7, 2014, were, simply put, extraordinary. The Courthouse, in extremely rare form, opened its doors, literally, to the performance of marriage ceremonies for same-sex couples. (Docket #47 ¶¶ 6-7). At least 70 couples arrived at the footsteps of the Courthouse asking that County officials preside over their unions. (Docket #47 ¶ 7). The combination of protesters, media, supporters, couples and their loved ones, converging on the same space at the same time had the real potential to devolve into frenzy. This Court has no doubt that maintaining order and safety at the Courthouse by splitting up rival, and potentially hostile, protestors served a compelling government interest.

*See Cutter v. Wilkinson*, 544 U.S. 709, 717 (2005) ("[S]afety and security…are undisputedly compelling state interests); *see also Weinberg v. City of Chicago*, 310 F.3d 1029, 1038 (7th Cir. 2002) ("There is no doubt the City has a legitimate interest in protecting its citizens and ensuring that its streets and sidewalks are safe for everyone."). In addition, as it became the law of the State that same-sex couples should equally enjoy the civil right of marriage (Docket #47 ¶ 5), government staff, including law enforcement officers like Deputy Terry, had an obligation to ensure that couples seeking to be married—both inside and outside of the Courthouse—could indeed do so without the threat of violence or disruption. Controlling the agitated crowd while these proceedings occurred protected the safety of all those individuals at or near the Courthouse—including Braun himself. (*See* Docket #47 ¶ 18).

Deputy Terry's decision to move Braun's protest to the water fountain was also narrowly tailored. *See id.* at 1040 ("A regulation is narrowly tailored if it 'promotes a substantial government interest that would be achieved less effectively absent the regulation.'") (internal citations omitted). Deputy Terry's reason behind selecting the water fountain was that the dispute between Braun and the same-sex marriage supporters had just occurred on the grass alongside the fountain. (Docket #47 ¶¶ 16, 18-19). The fountain, in fact, was only about 20 feet away from where Braun was originally standing. (Docket #47 ¶ 20). Thus, Braun's re-location was not only de minimus in nature, but also proportionate to the circumstances that precipitated the move. If Deputy Terry had not ordered Braun to move, a clash among the protesters may have unfolded, thereby disrupting the marriages occurring near the Wells Street Entrance. Luckily, it did not. Because the state's interest in security and order "would [have] be[en] achieved less effectively absent"

Braun's re-location to the fountain, Deputy Terry's order was narrowly tailored. *Id.*

Lastly, the Court finds that Braun's protest near the concrete area of the fountain left open ample alternative channels for Braun to communicate his message. *Marcavage*, 659 F.3d at 630. The water fountain where Braun protested occupies a central and prominent place in Clas Park. (Docket #47 ¶ 10). It stands immediately in front of the Wells Street Entrance. (Docket #47 ¶¶ 10, 32). The prominence of this position was reflected in the fact that Braun was broadcast on the evening news. (Docket #47 ¶ 22). Moreover, Deputy Terry did not impose any other conditions upon Braun's protest other than the general area where Braun could stand. (Docket #47 ¶ 34). Braun had ample opportunity to display his message in a central position outside the Courthouse, and Braun's signs were never confiscated or destroyed. (Docket #47 ¶ 34). Likewise, Braun was permitted to peacefully pass out pamphlets that reflected his message. (Docket #47 ¶ 34). There is no evidence to suggest that Braun's distribution of these pamphlets was affected by his re-location to the fountain. (Docket #47 ¶ 34). Thus, Braun had ample

opportunity to covey his messages, in multiple forms, despite the requirement that he stand near the fountain.[11]

In sum, Deputy Terry's order that Braun protest near the fountain did not violate Braun's First Amendment rights because the order was content-neutral, narrowly tailored to ensure safety and order at the Courthouse, and left open ample alternatives for Braun to communicate his message.

On the other hand, as the interior of the Courthouse is a nonpublic forum, Deputy Terry's decision to deny Braun access thereto need only be "viewpoint neutral and reasonable in light of the purpose served by the forum." *Davenport v. Washington Educ. Ass'n*, 551 U.S. 177, 189 (2007). This was indeed the case. In light of the unusual circumstances on June 7, 2014, government officials only permitted those individuals with official business into the Courthouse that day. (Docket #47 ¶ 12). Indeed, the Courthouse was operating outside of its normal business hours to accommodate couples seeking to be married on the heels of Judge Crabb's ruling. (Docket #47 ¶ 12). Thus, Braun's inability to enter the Courthouse was in no way related to his

---

[11]The Court notes that Braun's complaint, which is not verified, alleges that he was "told that protest signs were not allowed" and that Braun was told that he could not "distribute any of the fliers [he] had brought with" him. (Docket #19 ¶ 19). However, Braun does not allege he was deprived of the opportunity to hold signs and pass out fliers in his: (1) brief opposing summary judgment (Docket #58); (2) his objection to summary judgment (Docket #64); or (3) his supplement to his opposition of summary judgment (Docket #66). The defendants affirmatively allege that Braun's signs and pamphlets were never confiscated (Docket #47 ¶ 34), and even provided a picture of Braun holding up a sign at the water fountain outside the Courthouse (Docket #47 ¶ 22-23). Braun, in fact, confirmed that the photo provided by the defendants indeed is an accurate representation of him protesting on June 7, 2014. (Docket #47 ¶ 23). Under Federal Rule of Civil Procedure 56(e), Braun's unsupported allegations in his second amended complaint are not sufficient to raise a material issue of fact for summary judgment.

viewpoint, but rather was a result of the Courthouse's blanket policy to refuse access to anyone without "official business" to conduct inside. (Docket #47 ¶ 12). Moreover, this access restriction was reasonable in light of the purpose of the Courthouse's opening: to issue marriage licenses. Government officials who imposed this limitation, and the persons responsible for enforcing it, like Deputy Terry, reasonably concluded that the volume of people present for this occasion warranted the limited access rule. Indeed the restriction was a sensible effort to "facilitate the smooth operation" of the Courthouse's purpose on that day, *i.e.*, the issuance of marriage licenses. *Huminski*, 396 F.3d at 91.

In sum, neither of Deputy Terry's actions, *i.e.*, moving Braun to the fountain and denying him access to the Courthouse, violated Braun's free speech and free assembly rights under the First Amendment.

3.2     Fourteenth Amendment Claims

Braun claims that Deputy Terry's orders on June 7, 2014, violated Braun's equal protection and due process[12] rights by treating him differently from same-sex marriage supporters and inhibiting his ability to protest. (Docket #19). Both claims fail.

On the one hand, "[t]he Equal Protection Clause of the Fourteenth Amendment prohibits state action that discriminates on the basis of membership in a protected class or irrationally targets an individual for

---

[12]Braun's due process claim is difficult to understand. (Docket #19). On the one hand, Braun's complaint alleges a violation of "procedural due process." (Docket #19 ¶ 15). On the other hand, his complaint further details Braun's understanding of the rights guaranteed under "substantive due process." (Docket #19 ¶ 17). As the gist of Braun's complaint alleges substantive violations of the First and Fourteenth Amendments, and do not discuss anything related to "procedure," the Court will interpret Braun's claim to relate to substantive due process.

discriminatory treatment as a so-called 'class of one.'" *Reget v. City of La Crosse*, 595 F.3d 691, 695 (7th Cir. 2010) (citing *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591 (2008)). On the other hand, the Fourteenth Amendment's due process clause prohibits state officials from infringing on a person's "life, liberty or property without due process of law." U.S. Const. am. XIV. Substantive due process under the Fourteenth Amendment protects "fundamental liberty interest[s]" and against "arbitrary and unreasonable [government action], having no substantial relation to the public health, safety, morals, or general welfare." *Greater Chicago Combine & Ctr., Inc. v. City of Chicago*, 431 F.3d 1065, 1071 (7th Cir. 2005) (internal citations omitted).

In the context of both equal protection and substantive due process claims, the Court must ask whether the act in question impacts a fundamental right or targets a suspect class. *See Heller v. Doe*, 509 U.S. 312, 319 (1993). When no suspect class or fundamental right is involved, courts employ a rational basis test to determine whether the state action is constitutional. *Id.* The Court must uphold state action under this test so long as it "bears a rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631 (1996). When a suspect class or fundamental right is involved, state action must survive strict scrutiny. *See Srail v. Vill. of Lisle, Ill.*, 588 F.3d 940, 943 (7th Cir. 2009).

First, while freedom of speech is a fundamental liberty interest under the Fourteenth Amendment, *Reed v. Vill. of Shorewood*, 704 F.2d 943, 949 (7th Cir. 1983), the Court has already concluded that Deputy Terry's actions survived strict scrutiny under the First Amendment. (*See supra* Part 3.1.2). "Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior,

that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Albright v. Oliver,* 510 U.S. 266, 273 (1994) (internal citations omitted). Thus, Braun's claim that Deputy Terry violated Braun's substantive due process rights by limiting his speech is precluded. *See, e.g., Koutnik v. Brown,* 456 F.3d 777, 781 (7th Cir. 2006) (approving the district court's application of *Albright* to bar a § 1981 plaintiff from claiming both a First Amendment violation and substantive due process claim); *Eby–Brown Co., LLC v. Wisconsin Dep't of Agric.,* 295 F.3d 749, 754 (7th Cir. 2002) (refusing to analyze complaints of unequal treatment as substantive due process claims, as opposed to equal protection claims, under *Albright*); *see also Conyers v. Abitz,* 416 F.3d 580, 586 (7th Cir. 2005) ("[C]onstitutional claims must be addressed under the most applicable provision.").

Second, Braun's equal protection claim is substantively meritless. Nowhere in his complaint nor briefs does Braun set forth evidence that Deputy Terry's actions targeted a protected status. Rather, Braun argues that Deputy Terry discriminated against him as "pro-man/woman marriage demonstrator." (Docket #19 ¶ 23).

The Court has not found any case law to suggest that a "pro-man/woman marriage demonstrator" is a protected class. Moreover, that argument sounds more in the First Amendment context than in equal protection, and Braun's First Amendment claim has already been rejected. (*See supra* Part 3.1.2). Thus, Deputy Terry's actions need only survive rational basis review. *See Srail,* 588 F.3d at 943. "Rational basis review requires the plaintiff to prove that: (1) the state actor intentionally treated plaintiffs differently from others similarly situated; (2) this difference in treatment was

caused by the plaintiffs' membership in the class to which they belong; and (3) this different treatment was not rationally related to a legitimate state interest." *Id.*

Deputy Terry's actions survive the rational basis test. While Deputy Terry intentionally moved Braun away from the same-sex marriage supporters, he had a sensible reason to do so. As discussed at length above, Braun and the same-sex marriage supporters had nearly gotten into a physical altercation prior to Deputy Terry's order that Braun protest near the water fountain. (Docket #47 ¶¶ 18-20). Moreover, Braun's protests were interfering with official marriage proceedings. (Docket #47 ¶ 21). Thus, Deputy Terry's requirement that Braun stand near the fountain was a prudent decision to maintain security and order at the Courthouse.

To the extent Braun makes a "class of one" equal protection claim, he also fails. To make this type of equal protection claim, Braun must show that: "(1) [he] has intentionally been treated differently from other[s] similarly situated…; and (2) there is no rational basis for the difference in treatment or the cause of the differential treatment is a 'totally illegitimate animus'…." *Woodruff v. Mason*, 542 F.3d 545, 554 (7th Cir. 2008) (internal citations omitted). As Braun has failed to put forth any evidence suggesting his treatment was either irrational or based on "totally illegitimate animus," any class of one argument is without merit. *Id.*

Braun's claim for violation of the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment must fail; as such, the defendants are entitled to judgment as a matter of law.

### 3.3 Deputy Herrera Is Not Liable

Braun's claims against Deputy Herrera cannot stand. Without any underlying constitutional violation by Deputy Terry, Braun's claims against Deputy Herrera for "failing to intervene" must also fail. *See, e.g., Hart v. Mannina*, 798 F.3d 578, 596 (7th Cir. 2015), *reh'g denied* (Oct. 16, 2015) ("Because the district court properly dismissed Hart's claims against Detective Mannina and the other police officers who participated directly in the investigation leading to Hart's arrest, Hart's claims against several supervisory defendants and against the City of Indianapolis also fail.").

### 4. CONCLUSION

Because the Court finds that the defendants are entitled to summary judgment as a matter of law on both the First and Fourteenth Amendment claims, the Court need not address the defendants' remaining arguments.[13] *See Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 597 (7th Cir. 1997) (finding that when a court determines in a § 1983 case that no constitutional violation occurred, it is unnecessary to consider whether defendants are entitled to qualified immunity).

Lastly, the Court notes that Braun has filed two discovery-related motions in this case. (*See* Docket #36, #61). Each of these motions will be denied as moot in light of the Court's grant of summary judgment to the defendants.

Accordingly,

---

[13] As discussed above, the defendants argued in their brief that Deputy Terry cannot be liable under RFRA and for misconduct under Wis. Stat. Ann. § 946.12. (Docket #42). However, as the Court dismissed these claims against Deputy Terry in its Order granting partial judgment on the pleadings (Docket #29), their arguments as to these claims are moot.

IT IS ORDERED that the defendants' Motion for Summary Judgment (Docket #41) be and the same is hereby GRANTED, as more fully described in detail above, and that this action be and the same is hereby DISMISSED on the merits;

IT IS FURTHER ORDERED that the plaintiff's Motion to Compel (Docket #36) be and the same is hereby DENIED as moot; and

IT IS ORDERED that the plaintiff's Motion to Quash (Docket #61) be and the same is hereby DENIED as moot.

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 30th day of November, 2015.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge

Case 2:15-cv-00252-JPS   Filed 11/30/15   Page 23 of 23   Document 67